UNITED STATES of America

v.

N.A. WALDROP, a/k/a "Fat" Waldrop;
Lawrence Walsh; Sammy Little;
Wayne Sexton.

Nos. CR 91–083–01 to CR 91–083–04.

United States District Court,
M.D. Pennsylvania.

Nov. 12, 1991.

Barbara Kosik Whitaker, Asst. U.S. Atty., Scranton, Pa., for U.S.

Don Burley, Jeffrey Chasnow, Washington, D.C., for U.S.

Sal Cognetti, Scranton, Pa., Joel W. Collins, Jr., Columbia, S.C., for Fat Waldrop.

Charles P. Gelso, Moses, Gelso and Prociak, Wilkes–Barre, Pa., for Larry Walsh.

Dallas Ball, Pickens, S.C., for Sammy Little.

Thomas Blewitt, Dunmore, Pa., for Wayne Sexton.

**MEMORANDUM**

NEALON, District Judge.

In this criminal case, predicated upon an alleged odometer fraud,[1] there are several motions by the defendants to dismiss the indictments the United States (government) has brought against them.[2] Their defenses, *inter alia*, center on the application of the statute of limitations and the defendants' withdrawal from the conspiracy and substantive offenses.[3] For reasons which follow, the court will deny the defendants' motions.

## I.

The factual background of this case begins in South Carolina, where defendant Waldrop allegedly originated the odometer tampering scheme.[4] At all times relevant to this Memorandum, defendant Waldrop was the chief operating officer of Auction Recon Center, Inc., a South Carolina corporation and a wholesaler of used automobiles. Defendant Sammy Little owned Little's Used Cars, an automobile dealership, both wholesale and retail, also located in South Carolina. Defendant Wayne Sexton was an automobile mechanic who worked as an independent contractor for Auction Recon Center, reconditioning and repairing automobiles. Defendant Larry Walsh, a

---

1. The Government charges included:

 **Waldrop:**
 Count 1; 18 U.S.C. § 371 (conspiracy)
 Counts 2–3–4–5–6–7; 18 U.S.C. § 513 (possession of forged and counterfeited securities with intent to deceive)
 18 U.S.C. § 2 (aiding and abetting the above)
 Counts 8–9–10–11–12–13–14; 18 U.S.C. § 1341 (obtaining money or property by false pretenses or fraudulent representation)
 18 U.S.C. § 2 (aiding and abetting the above)
 Counts 15–16–17–18–19–20; 15 U.S.C. § 1988 & § 1990c (disclosure requirements upon transfer of automobile)
 18 U.S.C. § 2 (aiding and abetting the above)
 **Sexton:**
 Count 1; 18 U.S.C. § 371 (conspiracy)
 Counts 2–3–4–5–6; 18 U.S.C. § 513 (possession of forged and counterfeited securities with intent to deceive)
 18 U.S.C. § 2 (aiding and abetting the above)
 Counts 7–8–9–10–11; 18 U.S.C. § 1341 (obtaining money or property by false pretenses or fraudulent representation)
 18 U.S.C. § 2 (aiding and abetting the above)
 Counts 12–13–14–15–16; 15 U.S.C. § 1988 & § 1990c (disclosure requirements upon transfer of automobile)
 18 U.S.C. § 2 (aiding and abetting the above)
 *See* document 50 of record.

2. Defendant Walsh has not joined in these motions. Although defendant Little had joined in these defense motions, his claims have been mooted by his subsequent change in plea to guilty per an agreement with the government.

3. The defendants originally asserted a fifth amendment due process violation because of pre-indictment delay but were unable to present any competent evidence or argument demonstrating prejudice. *See United States v. Otto,* 742 F.2d 104 (3rd Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980. Consequently, this argument will not be addressed.

4. Unless otherwise noted, the recitation of the facts is taken from the stipulations of fact entered into by the government and defendants Waldrop, Little and Sexton.

purchaser and wholesaler of used automobiles, operated State Auto Sales, located in Dupont, Pennsylvania. Pat Walsh, the brother of Larry Walsh, was the owner of Honesdale Lincoln Mercury.

According to the government, the scheme unfolded as follows:[5] Waldrop would purchase high-mileage used cars for the purpose of resale. Once Waldrop received the cars, he would arrange for defendant Sexton to roll back their odometers.[6] Waldrop then directed the employees of Auction Recon Center to prepare bills of sale, title transfer documents, and odometer statements to appear as though Auction Recon Center had sold the cars at their correct high-mileage figures to defendant Sammy Little's used car dealership. The next step involved Waldrop directing Auction Recon employees to prepare transfer documents of the same cars from Little's Used Cars to State Auto Sales, defendant Walsh's dealership. However, the transfer documents from Little to Walsh contained the rolled back low-mileage readings that Sexton had accomplished at Waldrop's direction.

Little played an intermediate role in the scheme. In reality, the cars were sold directly from Waldrop to Walsh. Little had never even seen most of the cars that he had "bought" from Waldrop and later "sold" to Walsh. The government has characterized Little as a mere "straw" who acted as a front for the sham sales. Little's involvement consisted primarily of signing the paperwork that gave the appearance that he was involved in the transactions.[7] In return, Waldrop paid Little initially $100.00 per car, which was raised to $150.00 a car by the time the scheme had been discovered.[8]

As stated above, defendant Walsh was the true purchaser of Waldrop's clocked automobiles. When paying for the cars, Walsh would make a check payable to Little's Used Cars but would send it directly to Auction Recon Center. In return, Walsh would receive from Auction Recon the invoices and low-mileage odometer statements which reflected the purported sale from Little to Walsh, along with the cars' titles.[9]

To complete a sale of the clocked cars, Walsh eventually had to be able to procure a transferable title that reflected the cars' clocked odometer.[10] Allegedly Walsh "took whatever action was necessary" to obtain new titles for the cars that reflected the cars' clocked mileage. *See* document 57 of record. This required altering the certificates of title to conform to the clocked odometer readings, which, in turn, included forging the names of his brother and employees of Auction Recon Center and returning them to Penn DOT to obtain new titles that reflected those false clocked mileage figures.[11] Walsh then sold the cars with their new falsified titles to other dealers, consumers, etc. Cars # 7 and # 8, reflecting Counts 7–13–14–20 of the su-

---

5. The following is taken from the government's first, second and third briefs, *see* documents 45, 57, and 75, respectively, of record, along with the superseding indictment. *See* document 50 of record.

6. This process is sometimes referred to as "clocking."

7. The paperwork included invoices, odometer statements, and checks that reflected the purchase from Waldrop of the high-mileage automobiles.

8. Both defendants Waldrop and Little were under the impression that they were committing misdemeanors punishable by fines. Accordingly, part of the arrangement between Little and Waldrop was an agreement that Waldrop would

pay Little's fine should the authorities charge Little.

9. The cars' titles mostly reflected the cars' high-mileage odometer figures.

10. Apparently, the government itself does not know exactly how Walsh managed to get new titles for the cars from the Pennsylvania Department of Transportation (Penn DOT) that reflected the clocked mileage on the cars. The government does not expand, however, on its allusion to other methods which Walsh may have employed to accomplish this feat.

11. To "alter" the titles, Walsh would simply "erase" the existing odometer statement on the back of the title and write in the new clocked figure. He would then send the forged title into Penn DOT and request a new title. The new

perseding indictment, represent the scheme's end product.[12]

Sometime in May and June of 1985, the scheme went awry.[13] Walsh had sent 12 altered titles into Penn DOT for reissuance. The 12 titles represented cars with clocked odometers pursuant to the alleged plan. Penn DOT, however, upon inspection of the titles, detected apparent alterations to the mileage readings, and seized them, along with their accompanying applications for new Pennsylvania titles. Five of the above mentioned titles represent cars 1, 2, 4, 5, and 6 of the indictment, reflecting Counts 2–8–15, 3–9–16, 4–11–17, 5–12–18, and 6–19, respectively.[14] United States Attorney Don Burley received the 12 seized titles from Penn DOT in August of 1985, and he has retained possession of the titles as of the date of this Memorandum.

Notwithstanding the title confiscation, Walsh still had these cars on his hands and had to take additional steps to sell them. However, to properly effectuate their sale, Walsh had to procure new titles that contained the falsified odometer readings. Thus, on August 12, 1985, Walsh and his attorney, Ralph Iori, contacted Burley concerning the confiscated titles. During the course of their conversation, Walsh repre-

sented to Burley that he had been victimized by Little, and was unaware of the fact that the cars had their mileage altered. A few months later, Walsh resubmitted the applications for new titles to Penn DOT.

On November 15, 1985, apparently believing that Walsh was an innocent victim, Penn DOT issued new titles to Walsh for the automobiles whose titles they had previously seized.[15] These titles represented cars 1, 2, 4, 5, and 6 of the indictment. On the back of each title, which would normally contain an odometer reading, there appeared the code "999." The code denoted that the true mileage of each car was either unknown or that the mileage on the odometer was incorrect.

In February and March of 1986, Walsh submitted the same "999" titles to Penn DOT under the auspices [16] of Honesdale Lincoln–Mercury (his brother Pat's dealership) for new titles.[17] Inexplicably, Penn DOT issued new titles to the cars containing the falsified odometer readings. He later sold the cars to other purchasers between May and September of 1986 through his brother Larry's Honesdale Lincoln–Mercury dealership without his brother's knowledge or consent.[18]

---

title would then reflect the car's clocked mileage.

**12.** *See* document 50 of record. Walsh sold the cars, under the Honesdale Lincoln–Mercury name, as follows:

> **Car 7:** Sold to Independence Ford on *February 14, 1986*. Independence Ford, in turn, sold the car to Margaret Young on *August 14, 1986*.
>
> **Car 8:** Walsh sold this car under the State Auto Sales name on *June 21, 1985*, to Greytak Chevrolet. Greytak, in turn, sold the car to Crisconi Oldsmobile on *August 15, 1985*. Finally, Crisconi sold the car to Joseph Sapienza on *August 2, 1986*.

*See* document 80 of record.

**13.** The following is taken from documents 50 and 60 of record.

**14.** The title to Car # 3 of the indictment (Count 10) was also seized by Penn DOT. In response, Walsh asked Waldrop to obtain a duplicate South Carolina title for the car. Waldrop complied and sent the title to Walsh "open," *ie.*, devoid of transfer information. Walsh completed the title and resubmitted it to Penn DOT which issued a new title, reflecting the clocked

mileage, on July 3, 1985. *See* document 80 of record.

> Walsh sold the car under the State Auto Sales name to Jackson Motors on *July 3, 1985*. Jackson subsequently sold the car to Roger Hubert on *May 31, 1986*. *Id.*

**15.** The following is taken from the parties' stipulated facts. *See* document 60 of record.

**16.** Waldrop appears to argue that Larry Walsh had nothing to do with the submissions and sales of Honesdale Lincoln–Mercury. The court would note here that, according to the government, there was no "sale" of the five "999" clocked cars from State Auto Sales to Honesdale Lincoln–Mercury. On the contrary, the government asserts that the titles were fraudulently obtained through Little to Honesdale Lincoln–Mercury by, and for, Larry Walsh. *See* document 81 of record.

**17.** Indeed, the government claims that Larry forged his brother's signatures on all the necessary paperwork.

**18.** After Walsh, under the Honesdale Lincoln–Mercury (HL–M) name, received new titles for cars 1, 2, 4, 5, and 6, with the cars' false low-

In the meantime, Burley's office had arranged for William C. Kadlowec to investigate the chains of title to the 12 cars in South Carolina. Bill Kadlowec [19] was an odometer-tampering investigator employed by the state of South Carolina and appointed as a special investigator to the Federal Grand Jury in South Carolina. Sometime in late August or early September of 1985, Kadlowec learned that Auction Recon Center had sold several used cars to Little, who, in turn, sold them to Walsh. As it appeared to Kadlowec, the cars' odometers had been tampered with while in Little's possession. Sometime around September, 1985, based upon odometer statements provided to Kadlowec by Waldrop, Kadlowec asked Waldrop to have Little contact him concerning the odometer readings.

On September 12, 1985, Kadlowec talked with Little concerning Little's involvement with the tampered odometers. During that conversation, Little confessed to his role in Waldrop's scheme. Later, on April 26, 1986, Walsh revealed to the government the true background of the scheme. However, the government alleges that it was not a complete revelation because he failed, at the time, to disclose that he was still in the process of unlawfully selling the clocked cars that he still possessed.[20]

On June 1, 1986, a Federal Grand Jury convened in Columbia, South Carolina, to investigate the alleged odometer tampering. At that time, odometer tampering was a misdemeanor under the applicable law, 15 U.S.C. § 1990c. Walsh, Little and Sexton [21] all testified before the grand jury.[22] After hearing the government's evidence, the grand jury did not return any indictments.

On April 30, 1991, a Federal Grand Jury in the Middle District of Pennsylvania returned an indictment against defendants Waldrop, Sexton, Little, and Walsh for their respective roles in the odometer-tampering scheme.[23] The government has stipulated that it has no evidence of odometer tampering, nor any affirmative acts relating to odometer tampering, by any of the defendants, except Walsh, since August of 1985. See document 60 of record. Now, more than five years after the moving defendants actively participated in the scheme, they face the government's charges.

Consequently, inasmuch as the cut-off date for statute of limitations purposes is April 30, 1986, and defendants Little, Sexton and Walsh allegedly confessed and withdrew from the scheme, the moving defendants maintain that the indictments against them are time-barred. The government, on the other hand, steadfastly insists that a careful examination of the factual background of the case reveals that Walsh's part in the scheme occurred within the statute of limitations and, thus, all are

---

mileage on them, he subsequently sold them as follows:

**Car 1:** Walsh received the new title on February 10, 1986. He sold the car under the HL–M name to Linda Young on *May 6, 1986.*
**Car 2:** Walsh received the new title on March 10, 1986. He sold the car under the HL–M name to Francis Grady on *May 7, 1986.*
**Car 4:** Walsh received the new title on February 10, 1986. He sold the car under the HL–M name to Charles Campfield on *August 5, 1986.*
**Car 5:** Walsh received the new title on March 10, 1986. He sold the car under the HL–M name to Neiman's Used Cars on *September 10, 1986.*
**Car 6:** Walsh, under the HL–M name, applied for a new title to this car on February 26, 1986 which Penn DOT later issued. He then sold the car to Tunimac Empire Motors on *March 11, 1987.*
See document 80 of record.

**19.** The following facts are taken from the declaration of William C. Kadlowec.

**20.** Indeed, by the time the Grand Jury convened on June 1, 1986, Walsh had sold several of the vehicles contained in this indictment. (Counts 2–3–9–15 and 16).

**21.** This is the first identification in the record of Sexton disclosing his role in the operation. The defendants, in their supplemental brief in support of their motion to dismiss, *see* document 44 of record, allude to possible statements of Sexton allegedly made to the authorities prior to his grand jury testimony. However, at this point, the reference remains unsubstantiated.

**22.** As will be discussed later, the government insists that these defendants were less than fully cooperative.

**23.** That same grand jury presented a superseding indictment on August 6, 1991, which is the subject of the present motions.

culpable. The delay in indicting the moving defendants for their part in the scheme is the basis of the defendants' motions to dismiss the indictment.

## II.

As an initial matter, the court would note that "[i]n considering a defense motion to dismiss an indictment, the district court accepts as true the factual allegations set forth in the indictment." *United States v. Besmajian*, 910 F.2d 1153, 1154 (3rd Cir. 1990) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952)). In so doing, the court's inquiry is, of course, whether the indictment properly alleges a criminal offense. *Id.*

### III. Conspiracy

■ The defendants first argue that Count I of the indictment should be dismissed because the statute of limitations has already run on the conspiracy charges.[24] They assert that confession to the authorities is sufficient to withdraw from a conspiracy and that here it also insulated them from Walsh's criminal acts from the time Penn DOT seized the titles to cars 1, 2, 4, 5 and 6,[25] to the time he subsequently sold the cars to consumers. The defendants contend that the government's intervention, and their subsequent cooperation, terminated the conspiracy before April 30, 1986.

Defendant Waldrop argues that co-conspirators Walsh, Little and Sexton effectuated a withdrawal from the conspiracy when they confessed either to the investigator or before the Grand Jury.[26] This withdrawal, asserts Waldrop, relieved him of criminal responsibility for the conspiracy as well. Similarly, Sexton argues that his

withdrawal of the conspiracy absolves him under Count I of the indictment.

By contrast, the government argues that defendants Little, Sexton and Walsh had not fully disclosed their parts in the alleged scheme. Moreover, it asserts that the defendants did not do "everything within their power" to "prevent the commission of [the] crime," citing *United States v. Piva*, 870 F.2d 753, 757 (1st Cir.1989).[27] The government argues further that an assessment of the "quality" of the defendants' disclosures is required under *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). The gravamen of the government's position is that the defendants allowed the clocked cars to remain "in the pipeline," and that such passivity negated their attempted withdrawals.

"To establish a conspiracy under section 371, the Government must prove: (1) a combination of two or more persons, (2) an actual agreement, whether express or tacit, between those persons, (3) an unlawful purpose, and (4) an overt act by one of the conspirators." *United States v. Bevans*, 728 F.Supp. 340, 345 (E.D.Pa.1990) (citations omitted). Furthermore, "[a] defendant who is a member of a conspiracy may be charged with and convicted for substantive offenses committed by a co-conspirator in furtherance of the conspiracy at a time when the defendant was a member of the conspiracy." *United States v. Gonzalez*, 729 F.Supp. 1057, 1062 (D.N.J.1990). Indeed, "[it] is sufficient that the substantive crime be 'reasonably foreseeable as a necessary or natural consequence of the unlawful agreement.'" *Id.* at 1063.

■ The government does not need to show that an alleged conspirator knew all the details of the conspiracy, or even that

---

**24.** April 30, 1986, is the key date here because the Grand Jury returned the original indictment on April 30, 1991. The statute of limitations for the offenses begins to run upon the ceasing of the defendants' involvement in the scheme and lasts five years.

**25.** Defendant Waldrop cannot maintain this claim with regard to car 3 as he played a direct part in the acquisition of the car's new title, *i.e.*, he managed to secure a South Carolina title to

the car and sent it "open" to Walsh so that Walsh could complete the scheme.

**26.** There is no contention that defendant Waldrop made any admissions to the authorities.

**27.** The government contends, *inter alia*, that the defendants should have attempted to "buy back" the automobiles with the clocked odometers, or sell the cars at their correct high-mileage figures and divide the loss.

he knew all of the conspirators. *See, e.g. United States v. Jannotti,* 729 F.2d 213 (3rd Cir.1984); *see also United States v. Sophie,* 900 F.2d 1064, 1080 (7th Cir.1990). Moreover, the success of a conspiracy is immaterial so long as one of the conspirators committed an overt act in furtherance of the conspiracy. *Sophie,* 900 F.2d at 1080.

 As the government correctly noted, "an accused conspirator's participation in a criminal conspiracy is presumed to continue until all objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators." *United States v. Finestone,* 816 F.2d 583, 589 (11th Cir.1987) (citations omitted). The presumption can be overcome, however, by the defendant's showing that he withdrew from the conspiracy. *Id.* Withdrawal is an affirmative defense, which the defendant has the burden of proving. *Id.*

In discussing the obligations of both the defense and prosecution where withdrawal is raised as a defense, the Third Circuit Court of Appeals has noted that at trial:

[t]he defendant must present evidence of some affirmative act of withdrawal on his part, typically *either a full confession to the authorities* or communication to his co-conspirators that he has abandoned the enterprise and its goals. *United States v. Steele,* 685 F.2d 793, 803 (3rd Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982). Once the defendant has made a *prima facie* showing of withdrawal, the burden shifts to the government either to impeach the defendant's proof or *to show some act by the defendant in furtherance of the conspiracy and subsequent to the alleged withdrawal. Id.*

*United States v. Jannotti,* 729 F.2d 213, 221 (3rd Cir.1984) (emphasis added). The court went on to note that "one conspirator need not ... be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." *Id.* (citing

*United States v. Riccobene,* 709 F.2d 214, 225 (3rd Cir.1983)).

The conspirators' *modus operandi* contemplated the following: Waldrop bought high mileage used cars. Sexton rolled back the odometers. Waldrop arranged to have the cars spuriously transferred through Little to Walsh to appear as though Little rolled back the odometers. Walsh then acquired new titles to the cars reflecting the rolled back mileage. It was Walsh's role to adopt whatever means were necessary to ultimately sell these cars with false odometer readings to an unsuspecting public.

In applying the government's allegations to the facts which the court has before it, there can be little doubt that a jury could reasonably find that the government had not violated the statute of limitations with respect to the conspiracy count. The court cannot determine, as a matter of law, that defendants Little, Sexton and Walsh effectuated a withdrawal from the conspiracy from the facts presently before it.

**A. Little.** Defendant Little's cooperation with the authorities carries the strongest indicia of withdrawal. His signed confession to Bill Kadlowec of September 17, 1985, contained references to all of the cars in the present indictment. Kadlowec conceded at a hearing in this court on October 17, 1991, that Little was "very" cooperative with his investigation of Waldrop.[28]

However, the court need not decide at this time whether Little's cooperation amounted to a withdrawal. Even assuming, *arguendo,* that Little had effectively withdrawn from the conspiracy prior to April 30, 1986, the fact of his withdrawal bears no legal significance to the moving defendants' motions. As noted above, a conspiracy requires a combination of only more than one person. Based upon the facts the court has before it, a jury could reasonably find that the conspiracy among defendants Waldrop, Sexton and Walsh survived Little's withdrawal. Thus, the government could arguably prove at trial

---

**28.** As previously stated, the government continues to argue that Little was still protecting Waldrop despite his cooperation with Kadlowec.

that the conspiracy continued among the three remainders.

**B. Sexton.** Sexton argues that he withdrew from the conspiracy when he testified before the Grand Jury in South Carolina in June of 1986. The government argues that Sexton's testimony before the Grand Jury does not reflect that he was cooperating fully and, in any event, it occurred too late to have any significance on the statute of limitations issue.[29] With this latter position the court agrees. A jury should decide the former. Thus, Sexton cannot be deemed to have withdrawn, as a matter of law, from the conspiracy prior to April 30, 1986.

**C. Walsh.** The moving defendants argue vigorously that Walsh's actions pertaining to the selling of the cars listed in the indictment were the product of his own independent scheme to defraud the public and do not reflect his participation in the original plan with Waldrop. The government alleges that the obligation to implement the final phases of the plan was left to Walsh in Pennsylvania. Furthermore, it would appear that it was never intended that the South Carolina defendants would participate in the obtaining of false titles from Penn DOT.

All of the defendants were aware of the fact that these vehicles with clocked mileage readings had been delivered to, and were in the possession of, Walsh in Pennsylvania. The fact that Walsh may have encountered difficulty in procuring the false titles, *i.e.*, Penn DOT's seizure of five of the titles listed in the indictment, should not insulate the other defendants from criminal responsibility. The clocked vehicles that the South Carolina defendants had prepared, and the documents in support thereof, remained "in the pipeline" and on Walsh's lot in Pennsylvania. Thus, it cannot be concluded as a matter of law, that Walsh had withdrawn from the conspiracy by his subsequent actions.

It is true that the affirmative acts of all the defendants, with the exception of

Walsh, ceased prior to April 30, 1986. It is also true that a confession, standing alone, would not terminate a co-conspirator's role in a conspiracy unless that confession constituted a complete withdrawal. Here, however, that question is best left for a jury. It is certainly arguable, at least, that even after the scheme was unraveling, a jury could conclude that the defendants did not remove themselves from the conspiracy.

### IV. Substantive Offenses.

The moving defendants attack the government's substantive charges as time-barred as well. They first argue that they had effectively withdrawn from the scheme by the time Walsh carried out his alleged part and thus, they cannot be charged with mail fraud. Second, on a variation of that same theme, the defendants argue that, Walsh's procurement of new titles from Penn DOT after its issuance of "999" titles was an entirely independent plan which insulates them from criminal responsibility under the mail fraud statute. Finally, the defendants argue that the § 1988 and § 1990c charges are also time-barred.

With respect to the withdrawal, the government argues that withdrawal is no defense to mail fraud. The court agrees. In *United States v. Read*, 658 F.2d 1225 (7th Cir.1981), the Court of Appeals discussed, in detail, the differences between a conspiracy and a scheme per the mail fraud statute. There the court stated that:

> [t]he predicate for liability for conspiracy is an agreement, and a defendant is punished for his membership in that agreement. Mail and securities fraud, on the other hand, punish the *act* of using the mails or the securities exchanges to further a scheme to defraud. No agreement is necessary. A party's "withdrawal" from a scheme is therefore no defense to the crime because membership in the scheme is not an element of the offense.... As an aider and abettor, [the defendant] need not agree to the

---

**29.** The court again would note an absence in the record of any cooperation by Sexton prior to

the convening of the Grand Jury.

scheme. He need only associate himself with the criminal venture and participate in it.

*Id.* at 1240 (citing *United States v. Beck,* 615 F.2d 441, 448–49 (7th Cir.1980)). The court here is satisfied that the government has adequately alleged the moving defendants' participation, at least as aiders and abettors, in the odometer tampering plan.

■ Equally unpersuasive is the defendants' argument that Walsh's acquisition of new titles reflecting the clocked mileage of the cars from Penn DOT after it had issued "999" titles to those same cars was a wholly independent scheme within the meaning of the mail fraud statute. As noted in the discussion of the conspiracy charge, the court rejects the defendants characterization of Walsh as a wholly independent actor. The government has sufficiently alleged that Walsh's part in the overall scheme was to procure titles to the clocked cars and sell them to an unsuspecting public.[30] That Waldrop and Sexton were unaware as to how Walsh went about his task is irrelevant. *See United States v. Bibby,* 752 F.2d 1116, 1124 (6th Cir.1985).

Both parties disagree on the application of the reasoning in *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) to the issues in this case. *Schmuck* concerned an odometer tampering scheme substantially similar to the one presented here. The defendants maintain that the case is factually distinguishable because, as they interpret *Schmuck,* its applicability requires an *ongoing* odometer tampering scheme which is absent in this case. The court disagrees. As in *Schmuck,* the instant scheme depended upon, for its completion, a "successful passage of title among the various parties." *Id.* at 712, 109 S.Ct. at 1448. There, Justice Blackmun opined that,

> although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the

passage of title, which in turn was essential to the perpetration of Schmuck's scheme. As noted earlier, a mailing that is "incident to an essential part of the scheme" ... satisfies the mailing element of the mail fraud offense.

*Id.* at 712, 109 S.Ct. at 1448. *See also United States v. Locklear,* 829 F.2d 1314 (4th Cir.1987) (it was reasonably foreseeable to defendant that certificates of title would be mailed to consumers from a department of transportation and that the certificates would reflect fraudulent odometer statements). Mindful of the fact that all of the defendants were experienced in the business of selling used cars, it appears that a jury could find that the title mailings were foreseeable by them should the government prove the scheme as it is here alleged. *United States v. Shryock,* 537 F.2d 207 (5th Cir.1976).

■ Finally, the defendants' perceived statute of limitations violations concerning the § 1988 and § 1990c charges are baseless. Ultimate purchasers of clocked automobiles are "transferees" for purposes of § 1988. *See State of Utah v. B & H Auto,* 701 F.Supp. 201 (D.Utah 1988).

### V.

In conclusion, after considering the record as it now exists, and the arguments of counsel, it is obvious that, at the least, there are factual disputes concerning the time and the extent of the defendants' efforts to terminate the scheme not only as to the conspiracy count but as to the substantive counts as well. The appropriate vehicle for evaluating the evidence and making factual determinations is a trial by jury. Accordingly, the defendants' motions will be denied.

---

**30.** In this regard, any claim that an intermediate sale to other used car dealers constituted the completed offense is unimpressive. The indictment charges that the conspiracy and substantive objective of the scheme was to defraud public consumers. If a jury finds that this was the plan's objective, then an in-between sale to another dealer is of no moment. *United States v. Schmuck,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).