USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 96-1112
 UNITED STATES OF AMERICA,
 
 Appellee,
 
 v.
 
 RAFAEL RIVERA-FIGUEROA,
 
 Defendant, Appellant.
 ____________________

No. 96-1290
 UNITED STATES OF AMERICA,
 
 Appellee,
 
 v.
 
 DAVID GARCIA-BELTRAN,
 
 Defendant, Appellant.
 ____________________

No. 96-1291

 UNITED STATES OF AMERICA,

 Appellee,
 
 v.
 
 MIGUEL A. COLLAZO-DIAZ,
 
 Defendant, Appellant.
 ____________________

No. 96-1292

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOSE MIGUEL RODRIGUEZ-RODRIGUEZ,

 Defendant, Appellant.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Hector M. Laffitte, U.S. District Judge]
 ____________________

 Before

 Boudin, Circuit Judge,

 Coffin, Senior Circuit Judge,

 and Shadur, Senior District Judge.

 ____________________

 Marlene Aponte Cabrera, by appointment of the court, for
appellant Rafael Rivera-Figueroa.
 Raymond L. Sanchez-Maceira, by appointment of the court, for
appellant David Garcia-Beltran.
 Rafael F. Castro Lang by appointment of the court, for
appellant Miguel A. Collazo-Diaz.
 Yolanda C. Romagnolo, by appointment of the court, for
appellant Jose Miguel Rodriguez-Rodriguez.
 Mark Irish, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, Nelson Perez-Sosa, Assistant
United States Attorney, and Jose A. Quiles-Espinosa, Senior
Litigation Counsel, were on brief for the United States.

 
 
 May 5, 1998
 
 
 
 
 ________________
 
 * Of the Northern District of Illinois, sitting by designation. BOUDIN, Circuit Judge. Three appellants were convicted
of federal offenses growing out of a 1994 carjacking and murder in
 Puerto Rico and now appeal their convictions and sentences. A
fourth appellant, who pled guilty to a single offense, seeks review
of his sentence. We begin with a condensed version of the facts,
taken in the light most favorable to the verdict. United States v.
Bergodere, 40 F.3d 512, 518 (1st Cir. 1994), cert. denied, 514 U.S.
 1055 (1995).
 The appellants in this case are David Garcia-Beltran,
Rafael Rivera, Miguel Collazo and Jose Rodriguez-Rodriguez. On
August 24, 1994, all four gathered at a party at the home of
Rivera's ex-wife Karla in Toa Alta, Puerto Rico. Karla was then
involved with Abner Polanco. Also present, among others, were
Fernando Rodriguez-Reich and Manuel Garcia-Rivera. At some point
in the evening, the plan was hatched to murder Polanco; the tangled
motives apparently included a quarrel between Karla and Polanco,
jealousy on Rivera's part and a desire by some of the others for a
"pretty" pistol belonging to Polanco and audio equipment in his
car.
 At Garcia-Beltran's direction, Rodriguez-Reich was sent
to take other nonparticipating party-goers home so there would be
no witnesses. Thereafter, Garcia-Beltran told other confederates
to seize Polanco, and Garcia-Beltran gave a revolver to Collazo. 
After a struggle, Rivera and Collazo seized Polanco and took away
his pistol. The same two men, along with Garcia-Rivera and
Rodriguez-Rodriguez, forced Polanco into his own car and took his
car keys. They then took Polanco in his car to an isolated area
and, at the direction of Collazo, Rivera and Rodriguez-Rodriguez
both shot Polanco. All four perpetrators then fled in Polanco's
car.
 Later, Rivera turned over to Garcia-Beltran money that
had been taken from Polanco, and Rodriguez-Rodriguez gave Polanco's
pistol to Garcia-Beltran. Rodriguez-Rodriguez and Collazo
transferred Polanco's audio equipment from Polanco's car to
Rodriguez-Reich's car; subsequently at a roadblock, the police
apprehended Collazo and Rodriguez-Reich in the latter's car with
the audio equipment aboard. The police were aided in their efforts
by a so-called dying declaration of Polanco to be later described. 
 On August 31, 1994, a federal grand jury indicted
Rodriguez-Reich, Collazo and Garcia-Beltran. A superseding
indictment added Rivera, Rodriguez-Rodriguez and Garcia-Rivera. 
Each defendant was charged in two counts: one for carjacking, 18
U.S.C. 2119(3), and the other for using and carrying a firearm
during and in relation to a crime of violence, 18 U.S.C. 
924(c)(1). The indictment charged aiding and abetting in addition
to direct participation. 18 U.S.C. 2(b).
 In due course, the government secured the cooperation of 
three of the six--Rodriguez-Reich, Rivera and Garcia-Rivera--and
after a plea bargain, each agreed to testify at the trial of the
remaining three. Garcia-Beltran, Collazo, and Rodriguez-Rodriguez
were tried in October 1995. Each defendant was found guilty on
each count, and these three men now appeal. They are joined in the
appeal by Rivera, who seeks review only of his sentence. 
 At the threshold of this appeal, the appellants argue
that the carjacking statute exceeds Congress's power under the
Commerce Clause and is unconstitutional under United States v.
Lopez, 514 U.S. 549 (1995) (statute making unlawful the possession
of a firearm in a "school zone"). In contrast to the statute
involved in Lopez, 18 U.S.C. 2119 contains an element designed to
establish federal power, namely, that the vehicle must have been
transported, shipped, or received in interstate or foreign
commerce. This is a specific element that must be charged and
proved to make the carjacking a crime.
 The use of motor vehicles to facilitate--indeed to
conduct--interstate and foreign commerce is obvious, and Congress's
effort to extend protection to the very instruments of interstate
and foreign commerce is reasonable on its face and amply supported
by precedent. Perez v. United States, 402 U.S. 146, 150 (1971). 
At least seven circuits have already upheld the same statute
against constitutional challenge, and none has taken the view that
the statute is undermined by Lopez. We join in the unanimous
opinion of the other circuits.
 It is quite true that the carjacking statute has become
one more device for extending federal jurisdiction over serious
crimes that hitherto were by tradition largely left to local
authorities and courts; the felon-in-possession statute is an even
more dramatic example. 18 U.S.C. 922(g)(1). But so long as the
constitutional nexus exists, as it does here, the choice is
essentially one of policy. Whatever the merits of the arguments
about federalizing once local crimes, the policy disputes are for
Congress to resolve.
 Turning to the merits, only one of the appellants
contests the sufficiency of the evidence. Not surprisingly, the
challenge comes from Garcia-Beltran, who did not travel to the site
of the execution or participate in the murder. Garcia-Beltran
argues that there was insufficient evidence to convict him of
carjacking because, while he may have had the intent to kidnap and
murder Polanco, there was no evidence that Garcia-Beltran intended
to commit carjacking.
 Although the government does not attempt to answer the
argument, there is an answer. The statute provides that it is a
crime for someone with the intent to cause death or serious bodily
harm, to "take[] a motor vehicle that has been transported,
shipped, or received in interstate or foreign commerce from the
person or presence of another." At the time of Polanco's murder,
the statute further required that this be done while "possessing a
firearm" as defined elsewhere in the Criminal Code. A later
amendment altering this last quoted phrase is irrelevant to a pre-
amendment crime. Pub. L. 103-322, tit. VI, 60003 (a)(14), 108
Stat. 1970.
 Under this statute, we may assume that a defendant who
"takes a motor vehicle" must know what he is doing, and that this
knowledge must be possessed by a defendant who merely directs
another to act (and so is liable as a principal, 18 U.S.C. 2(a))
or assists the taker (and is so liable as an aider and abettor, 18
U.S.C. 2(b)). See United States v. Taylor, 54 F.3d 967, 975 (1st
Cir. 1995). But nothing in the statute requires that the taking be
an ultimate motive of the crime. It is enough that the defendant
be aware that the action in which he is engaged, whether by himself
or through direction or assistance to another, involves the taking
of a motor vehicle.
 Viewing the evidence in the light most favorable to the
verdict, we have no difficulty in finding sufficient evidence of
the requisite awareness on Garcia-Beltran's part. Two witnesses
testified that Garcia-Beltran ordered the other defendants to take
Polanco away and kill him, knowing full well that his confederates
would take Polanco's car, and would be carrying, and ultimately
using, the gun he gave them. In fact, the confederates initially
resisted the order, objecting to Garcia-Beltran that they did not
want to be involved in carjacking.
 We turn now to alleged trial errors. The most
complicated claim stems from a declaration made by Polanco after
the shooting. Although shot in the chest, he was able to make a
statement to the police before he died. In the statement, he said
--according to the police sergeant's later report to the FBI--that
he had been kidnapped by someone whom he described in terms that
pointed to Garcia-Beltran and that there were three other persons
involved. He gave some identifying information, although not the
proper names, as to two of the three other individuals and said
that the last he knew by sight only.
 In the government's view, the information given by
Polanco implicated Garcia-Beltran, Collazo and Rodriguez-Reich. 
However, the eyewitness evidence of the government's cooperating
witnesses makes clear that Garcia-Beltran and Rodriguez-Reich were
not part of the group that drove away with Polanco and later shot
him. When the implicated appellants moved to suppress the
declaration, the government defended its admissibility as a dying
declaration, but the district court suppressed the statement,
saying that it was "inaccurate. It's full of riddles. It's full
of questions. It's contradicted." 
 The first claim on appeal arising out of the suppression
of Polanco's statement is that of Rodriguez-Rodriguez. He argues
that the alleged dying declaration should have been admitted as
exculpatory evidence since Polanco did not name Rodriguez-
Rodriguez. The government contends that this claim was waived
because it was not raised at the suppression hearing. It also
argues that the dying declaration rule applies by its terms only to
a prosecution for "homicide," Fed. R. Evid. 804(b)(2), and
therefore not to a "carjacking" even if a death is involved.
 Bypassing both issues for a moment, we agree with
Rodriguez-Rodriguez that the district court cannot exclude a dying
declaration merely because the judge thinks that it is unreliable. 
In context, the district judge's remarks come close to being--and
may even have been intended as--a ruling under Fed. R. Evid. 403
that the probative value of the evidence was substantially
outweighed by its capacity for unfair prejudice or for misleading
the jury. But the judge's remarks were directed against the use of
the declaration to inculpate two of the appellants; the calculus
would be different if the declaration were used only to exculpate--
although that would have almost certainly required a severance.
 The difficulty is that there was no objection from
Rodriguez-Rodriguez when the other defendants pursued their motion
to suppress in the district court. Had the objection been timely
made, the court would have been confronted with a different set of
arguments for admissibility, a conflict in position among the co-
defendants, and the possibility of a severance if the court agreed
that the evidence should be admitted as to one co-defendant but
excluded as to the others. This was the occasion for Rodriguez-
Rodriguez to object to the suppression motion, and yet no such
objection was made until six months later, when Rodriguez-Rodriguez
first moved for a severance so that the declaration would be
admitted.
 A motion to suppress evidence effectively advances the
time at which a party who wants that evidence admitted has to argue
for that result. Although it may be easier to revisit such rulings
than ones made in the course of the trial, rulings in limine are
relied upon by the court and the parties in preparing for trial. 
The failure to object to a suppression motion is as much a waiver
as any other failure to object, subject always to the right of a
party who waived an objection to argue on appeal for plain error
review. Fed. R. Evid. 103(d); United States v. Olano, 507 U.S. 725
(1993).
 Under the plain error standard, it is necessary to show
not only that the exclusion of evidence was error--which we will
assume purely arguendo--but also that there is a substantial
likelihood that the admission of the evidence would have led to a
different result. Olano, 507 U.S. at 734-35 ("must have affected
the outcome"). But Polanco's dying declaration did not say that
the persons he "named" were the only ones involved; on the
contrary, he said that there was a fourth person whom he could not
identify. Without a showing that Polanco knew Rodriguez-Rodriguez
well enough to name him, the dying declaration had limited tendency
to exculpate Rodriguez-Rodriguez; and in view of the direct
testimony against him by co-defendants, we cannot find it likely
that admitting the dying declaration would have led to an
acquittal.
 Collazo has a different argument relating to the dying
declaration. He asserts that the declaration was properly excluded
by the district judge but was then effectively introduced by
prosecution testimony through the back door. The testimony was
that of a police officer who said, in direct examination, referring
directly to Collazo by a nickname:
 The cream-colored Toyota went past with his
 [sic] windows down. Three individuals were in
 it. I was able to recognize one of them as
 one of the persons who had been named as
 having to do with the case, and I told the
 sergeant: "It's them. There goes Guelito
 [the nickname of Collazo]."

 It is quite true that the police were looking for Collazo
and several others immediately after the shooting because they were
identified at least by nicknames or other indicia in Polanco's
dying declaration, but the trial testimony made no mention of the
declaration. Only a clairvoyant juror could have guessed at its
existence. All that the jurors learned was that for some unknown
reason, the police were seeking Collazo in connection with the
case.
 Of course, in many contexts, it might be error to tell
the jury that the police had unknown information connecting
defendant to the crime. But the glancing reference in this case
does not approach the force of a dying declaration actually naming
the defendant. Further, any mischief worked by this comment was
dwarfed by the eyewitness testimony of collaborators linking
Collazo to the crime and by other evidence, including proof that
Collazo was arrested shortly after the murder in a car filled with
audio equipment stolen from Polanco's car.
 The last issue that warrants separate discussion is a
claim of Garcia-Beltran involving jury instructions. On the last
day of trial, Garcia-Beltran asked that the jury be instructed on
the elements of the crime of being an accessory after the fact. 18
U.S.C. 3. The district judge rejected the request on the ground
that while the evidence permitted the jury to find that Garcia-
Beltran was a full participant in a carjacking, there was no record
basis for the accessory-after-the-fact theory. Garcia-Beltran
renewed his objection after the charge was given and now claims
error.
 It might not have been literally impossible for a
rational jury to acquit Garcia-Beltran of carjacking but still to
find that he was an accessory after the fact. There was testimony
from one witness that Garcia-Beltran was asleep at the time that
the carjacking plan was adopted but that he did participate in
post-crime activities that might have been characterized as
concealing the crime or hindering the investigation. In theory,
but only in theory, a jury might have accepted this testimony,
while disbelieving the far more substantial testimony as to Garcia-
Beltran's central role in the crime.
 However, even on this premise, the legal basis for the
instruction is thin. A defendant is ordinarily entitled to a
lesser-included-offense charge, if consistent with the evidence. 
Schmuck v. United States, 489 U.S. 705, 715-16 & n.8 (1989); seealso Fed. R. Crim. P. 31(c). For obvious reasons, it is often to
the defendant's advantage to request such a charge. But using the
"elements" test adopted by the Supreme Court in Schmuck, 489 U.S.
at 716, an accessory-after-the-fact offense is almost never going
to be a lesser included offense as to the principal crime.
 The Ninth Circuit has assumed in a passing dictum that an 
accessory-after-the-fact charge could be required at the
defendant's behest as a lesser-included-offense instruction, United
States v. Dinkane, 17 F.3d 1192, 1200 (9th Cir. 1994), but the
court's brief discussion overlooks the Supreme Court's "elements"
approach. A more defensible precedent from Garcia-Beltran's
standpoint is United States v. Brown, 33 F.3d 1002, 1003-04 (8th
Cir. 1994). There, the Eighth Circuit held that where justified by
the evidence, an accessory-after-the-fact instruction might have to
be given as a form of "defense."
 The Eighth Circuit's approach appears to us liable to
mislead the jury. A charge normally tells the jury that each
element of the charged offense must be proved. To give the jury an
additional set of elements for an uncharged crime that is not a
lesser included offense, and of which the defendant seemingly
cannot be convicted, seems to us a recipe for confusion. Where
appropriate, the court can properly explain to the jury that the
defendant's theory of the case is that he merely assisted in
covering up the crime but did not participate in its commission. 
This achieves the Eighth Circuit's purpose without the same risk of
confusion.
 In all events, in this case the Eighth Circuit's
instruction--or the Ninth Circuit's for that matter--would not have
altered the result. The evidence that Garcia-Beltran was an
accessory after the fact was quite limited, but the evidence of his
complicity in the carjacking itself was overwhelming, once the jury
decided (as it clearly did) to credit the eyewitness testimony of
the confederates who testified at trial. If it was error to omit
the accessory-after-the-fact instruction, which we do not think it
was, it certainly was harmless error.
 About a dozen additional claims have been made by the
four appellants, including objections to the voir dire, alleged
prosecutorial misconduct, refusal to replace appointed counsel,
admission of threats, failure of the judge to depart downward in
sentencing and similar matters. We have reviewed each of these
charges. While a number of them are legitimately raised, they are
adequately answered in the government's brief or otherwise present
no issue that needs substantial discussion.
 Accordingly, the convictions and, to the extent
challenged, the sentences imposed are affirmed.