**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David McQUEEN, Defendant–
Appellant.**

No. 14–2561.

United States Court of Appeals,
Sixth Circuit.

Jan. 19, 2016.

BEFORE: SILER, MOORE, and GIBBONS, Circuit Judges.

SILER, Circuit Judge.

David McQueen appeals his conviction and sentence for six counts of mail fraud, four counts of spending money laundering, one count of structuring, and one count of concealment money laundering. For the reasons explained below, we **AFFIRM**.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2006, McQueen used a home equity loan acquired from the purchase of a rental home to personally invest in Maximum Return Trading (MRT).[1] Jim Clements, the owner of MRT, represented to McQueen that Clements was earning returns of forty to fifty percent per month from currency trading. Clements told McQueen that he would receive a twenty-percent return, but it would eventually drop to ten percent. Soon after his initial investment with MRT, McQueen started accepting funds from others on behalf of his own company, Accelerated Income Group (AIG), to invest in MRT. In turn, he paid a five-percent return to those who had invested in AIG from the total ten percent he was receiving from MRT.

For a short period of time, MRT fulfilled its obligations by making the promised returns to AIG. However, in mid–2007, MRT ceased making payments to AIG. Subsequently, McQueen stopped sending his investors' funds to MRT in mid–2007. Except for some nominal amount, MRT was insolvent. Despite the lack of returns from MRT, which were the only significant source of revenue for AIG at that time, McQueen managed to meet his payment obligations to preexisting AIG investors from the only source available to him: funds from new investors.

McQueen also established three other investment funds, International Opportunity Consultants (IOC), Diversified Global Finance (DGF), and Diversified Liquid Asset Holdings (DLAH). With the help of his bookkeeper, Tricia Rice, McQueen comingled the funds from these newly created entities, paid himself a monthly salary ranging from $75,000 to $120,000, and compensated agents who helped him find new investors. McQueen personally received about $3.2 million in investor funds and spent an additional $3.1 million for business-related travel and other miscellaneous expenses. In addition, McQueen disbursed approximately $3.6 million in commissions for agents, who were paid between one and five percent for every month an investor's money remained with one of McQueen's entities.

Following a tip from a financial institution in early 2008, IRS Agent Barbara Birdsong started investigating McQueen. In 2009, the IRS and the FBI executed a search warrant for McQueen's home, a home of one of McQueen's associates, and several business locations tied to McQueen. The search revealed severely depleted assets; the agencies recovered only $433,467 from McQueen's accounts.

In 2011, a grand jury indicted McQueen and Trent Francke, McQueen's business associate since 2007, for mail fraud, money laundering, and structuring. A superseding indictment added Jason Juberg, Donald Juberg, and Penny Hodge as codefendants and new allegations of securities fraud. Prior to trial, Francke, Hodge, Jason Juberg, and Donald Juberg pleaded guilty. McQueen was convicted at trial on six counts of mail fraud, four counts of spending money laundering, one count each of structuring and concealment mon-

---

1. Although the government identifies MRT as "Multiple Return Transactions" in its brief, both Trent Francke and McQueen referred to the company as Maximum Return Trading in their testimony.

ey laundering, and three counts of misdemeanor failure to file tax returns. The jury acquitted McQueen of one count each of mail fraud, spending money laundering, and concealment money laundering.[2] The district court sentenced McQueen to 360 months of imprisonment, \$32,036,997.63 in restitution, and three years of supervised release.

## ANALYSIS

On appeal, McQueen raises nine issues falling into three main categories. First, he argues that there was insufficient evidence to convict him of twelve counts related to his investment scheme.[3] In connection with his sufficiency-of-evidence argument, McQueen contends that the government failed to disprove his reliance-on-counsel defense. Second, he asserts that his sentence violated the Eighth and Fourteenth Amendments and was procedurally and substantively unreasonable. Lastly, he maintains that he is entitled to a new trial based on cumulative error.

## I. Sufficiency of the Evidence

"We 'review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction.'" *United States v. Howard*, 621 F.3d 433, 459 (6th Cir.2010) (quoting *United States v. Carson*, 560 F.3d 566, 579 (6th Cir.2009)).

### A. Mail Fraud

Pursuant to 18 U.S.C. § 1341, it is a criminal offense to use the mail for the purposes of defrauding another. To prove a violation of § 1341, the government must establish three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Hartsel*, 199 F.3d 812, 816 (6th Cir.1999) (citing *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)).

### 1. Intent to Defraud

█ McQueen argues there was insufficient proof that he intended to defraud his investors because "[t]he evidence made clear that very few lenders actually spoke or communicated with [him]," and he "believed in many of the deals that [his] companies invested in." Testimony at trial, however, directly contradicts the former contention; multiple witnesses recalled speaking with McQueen about the investments and hearing him speak to groups of investors. McQueen's belief in the eventual success of some of these companies is not an acceptable defense to fraud. *See United States v. Stull*, 743 F.2d 439, 446 (6th Cir.1984) ("[C]ourts have consistently held that a defendant's honest belief in the ultimate success of a venture is not in itself a defense to a charge of mail fraud.... '[N]o matter how firmly the defendant may believe in the plan, his belief will not justify baseless, false, or reckless representations or promises.'") (quoting *Sparrow v. United States*, 402 F.2d 826, 828 (10th Cir.1968)).

The government contends that McQueen made four types of material misrepresentations by telling investors that: "(1) he would actually invest their money, (2) the investments were safe, (3) he was solvent, and (4) he was making money." Briefly,

---

**2.** Prior to the jury verdict, the government dismissed all counts related to securities fraud and one count of mail fraud.

**3.** Although McQueen initially challenged the three counts of misdemeanor failure to file tax returns in his Rule 29 motion, his brief is bereft of any dispute as to those convictions.

we explore the facts supporting the "intent to defraud" element.

McQueen invested only approximately thirty percent[4] of the funds entrusted to him. In fact, DLAH, one of McQueen's companies, had no record of investments. Notwithstanding the investment of only a small portion of the funds, investors received statements in the mail bearing a "Money Trading" line item, engendering their belief that McQueen was investing their funds. Unsurprisingly, McQueen's clients said they would not have used his services if they had known that he was not going to invest all of their money.

Additionally, investors testified that McQueen assured them that their funds were safe. Raymond Boerema, who invested in DLAH, specifically recalled McQueen describing his investment as "fully guaranteed" and "risk free." However, many of McQueen's investments were speculative in nature and often failed—a fact not communicated to his clients. Investors were also told and provided written statements reflecting that their funds were guaranteed by a reinsurance company and backed by gold. While McQueen did have some gold, Francke testified that it was an insufficient amount to fully back the investors' accounts. When asked about the existence of a reinsurance company, Francke testified that he was "unaware of [a reinsurance company] except conceptually that there was to be [one] someday."

Lastly, McQueen represented to his investors that his business ventures were successful. Of the investments McQueen made, the vast majority yielded a negative return. In fact, once MRT stopped making interest payments to AIG, McQueen satisfied redemption requests and interest payments only by using money from *new* investors.

The evidence revealed that McQueen made false representations to investors concerning the risk involved in their investments, the amount of their funds actually being invested, his ability to fulfill their redemption requests, and the success of his investments. Therefore, a rational factfinder had ample proof to conclude beyond a reasonable doubt that McQueen intended to defraud investors.

## 2. Reliance on Counsel

■ McQueen claims that the government could not have met its burden of showing that he intended to defraud investors because evidence demonstrated that he acted in reliance on counsel. The government's response is twofold. First, the government argues that McQueen failed to raise this issue in his Rule 29 motion for acquittal, thereby waiving the argument and rendering it reviewable under only the manifest-miscarriage-of-justice standard. *See United States v. Guadarrama,* 591 Fed.Appx. 347, 351 (6th Cir.2014). Second, the government asserts that McQueen neither fully disclosed all the details of his operations nor relied on advice of counsel in good faith, both of which are prerequisites to the reliance-on-counsel defense.

The reliance-on-counsel defense requires a showing of "(1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice." *United States v. Moss,* 69 Fed.Appx. 724, 732 (6th Cir.2003). In the present matter, the district court instructed the jury that good faith reliance on counsel constituted a complete defense to mail fraud and money laundering.

---

4. Testimony at trial reflected that McQueen initially invested about $26 million, or a little over fifty percent, of investor funds, but then lost $13 million in investments. The remaining $13 million was redirected for purposes other than investment.

Turning first to the issue of waiver, McQueen does not dispute that he failed to raise his claim of reliance on counsel in his Rule 29 motion; instead, he asserts that he was not required to raise this issue because it is an affirmative defense. To support his argument, McQueen relies on *United States v. Phillips,* 477 F.3d 215 (5th Cir.2007), but *Phillips* has nothing to do with a defendant's obligation to raise a defense on a Rule 29 motion. *See id.* at 219 (finding that because the defendant first raised the issue of loss in his Rule 29 motion, any argument concerning intent would be considered newly raised and reviewed only for a "manifest miscarriage of justice" (quoting *United States v. Green,* 293 F.3d 886, 895 (5th Cir.2002))). Ultimately, this issue need not be resolved. Even applying a standard of review more favorable to McQueen,[5] we find McQueen failed to meet the burden of establishing this defense.

McQueen claims to have relied primarily on the advice of two attorneys, Bob Rutgers and Thayer Lindauer. McQueen explains that Rutgers' firm, Rhoades McKee, "advised McQueen extensively on how to raise money using exceptions (exemptions) under the United States securities laws as well as counseling and assisting in developing an off-shore Bahamian company and researching the New Zealand entity." In sum, McQueen asserts that Rutgers knew about his businesses but never advised him to change his investor disclosures or the account statements sent to the investors. However, McQueen was not convicted of securities violations; instead, a jury found

him guilty of defrauding his investors by running a Ponzi scheme.

Rutgers testified that he was not involved in investigating McQueen's investments, directing the flow of money, or monitoring McQueen's bank accounts. McQueen told Rutgers that his businesses were successful and that his net worth was $20 to $30 million. Even assuming that McQueen completely disclosed all aspects of his businesses, this would not absolve McQueen of the fact that he lied to investors by telling them that their investments were safe, failed to invest their funds, and sent statements informing them that their money was growing. Such an argument would be inconsistent with the second prong of the defense; that is, McQueen could not have acted in *good faith* while also being dishonest with investors. *United States v. Poludniak,* 657 F.2d 948, 959 (8th Cir.1981) ("[No] man can willfully and knowingly violate the law, and excuse himself from the consequences thereof by pleading that he followed the advice of counsel." (quoting *Williamson v. United States,* 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278 (1908))). The evidence supports the conclusion that McQueen failed to fully disclose all pertinent facts to Rutgers.

Lindauer started working with McQueen in 2008 to help McQueen "structure his businesses." According to McQueen, although Lindauer suggested in July 2008 that McQueen needed to improve his disclosures, Lindauer told him to continue with business as normal, failing to provide specific direction as to how to make disclosures compliant. McQueen claims that

---

**5.** It should be noted that McQueen fails to articulate a more favorable standard of review in this circumstance. However, because the jury, not the district court, rejected McQueen's reliance-on-counsel defense, we review under the "any rational trier of fact" standard. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.").

Lindauer told him that new investor deposits could be used to pay old investors.

When asked about one of the initial meetings with McQueen, Lindauer recalled as follows:

> I had asked Tri[cia Rice] to ... bring me some jackets from ... people who put money on it. And I see, well, five or ten of them and I started looking through them. And I didn't like the way it was done. I didn't think there was enough disclosure. And I told David and Rutgers you can't do this. This is not right. I won't work for you if this is the way you are going to raise money. You have to hire securities counsel and you will have to pay all these people back. And I'll work for you as long as you are willing to do that, period.

By the time McQueen engaged Lindauer as counsel, McQueen had already been operating his Ponzi scheme for a full year by using new investor funds to satisfy payments to old investors. However, at Lindauer's insistence, McQueen contacted a securities lawyer, Kim Baber, to assist in making necessary disclosures to investors. Nevertheless, while Baber was working on a private placement memorandum for McQueen, McQueen continued to raise funds from investors without Lindauer's knowledge. McQueen claims that "Ted Lindauer was 100% involved with [McQueen's] companies," but this is hard to reconcile with Lindauer's testimony disclaiming knowledge of several of McQueen's investments. Therefore, there was sufficient evidence to reject McQueen's assertion that he fully disclosed all pertinent facts to Lindauer.

In addition to Rutgers, Lindauer, and Baber, McQueen received advice from other attorneys. In 2009, Ron Geffner counseled McQueen on securities issues and informed McQueen that he had concerns that McQueen was violating securities laws and engaging in fraud. Geffner expressly told McQueen that he believed McQueen may be engaged in a Ponzi scheme and that McQueen should make a self-disclosure to the SEC. But McQueen's conversation with Geffner was not the first time that an attorney had suggested to McQueen that he was running a Ponzi scheme. Jeff Gery met with McQueen in 2008 to interview for a job. Although McQueen did not retain Gery as counsel, Gery sent McQueen a letter that enclosed material about recent Ponzi schemes because he was concerned that McQueen and Francke were potentially involved in fraud. Notwithstanding the advice of multiple attorneys and even the execution of a search warrant, McQueen remained undeterred from operating his scheme, continuing to squander investors' funds in speculative investments and to pay his personal expenses.

Moreover, there are numerous other instances where McQueen either failed to fully disclose the extent of his operation or ignored advice of counsel. In sum, a rational trier of fact could have concluded that there was sufficient evidence demonstrating that McQueen did not act on reliance of counsel.

### 3. "Use of Mails" Element

■ McQueen contends that "[t]here was insufficient evidence produced that at the time that [the] mailings in question went out, false, material, information was included or omitted by [him] for the purpose of defrauding the lenders in Counts 2, 3, 4, 5, 7, and 8."

During McQueen's Rule 29 motion, McQueen addressed only whether there was sufficient evidence to establish the "intent to defraud" element in challenging the charges of mail fraud. McQueen does not appear to contest that he failed to raise

an argument about the "use of mails" element. "Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not ·specified in the motion are waived." *United States v. Love,* 553 Fed.Appx. 548, 553 (6th Cir. 2014) (quoting *United States v. Chance,* 306 F.3d 356, 369 (6th Cir.2002)). Therefore, we review McQueen's challenge to the "use of mails" element under the manifest-miscarriage-of-justice standard, warranting reversal "only ... if the record is devoid of evidence pointing to guilt." *Guadarrama,* 591 Fed.Appx. at 351 (quoting *United States v. Carnes,* 309 F.3d 950, 956 (6th Cir.2002)).

To be convicted under the mail fraud statute, the mailings must be used in the "execution of the fraud," but "the use of the mails need not be an essential element of the scheme." *Schmuck v. United States,* 489 U.S. 705, 710, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citing *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). "It is sufficient for the mailing to be 'incident to an essential part of the scheme.'" *Id.* at 710–11, 109 S.Ct. 1443 (quoting *Pereira,* 347 U.S. at 8, 74 S.Ct. 358). Further, both " 'innocent' " mailings—ones that contain no false information—and "routine" mailings may suffice to satisfy the mailing element under the statute. *Id.* at 715, 109 S.Ct. 1443 (citation omitted). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time...." *Id.*

One of the key ways that McQueen defrauded his investors was by assuring them that their money was safe and growing, even though this was impossible since McQueen had no real source of income other than new investors once MRT stopped making payments. Nevertheless, investors Raymond and Mildred Boerema (count 4), Joyce Neideffer (count 5), Jeff Roede (count 7), and Brian Beckett (count 8) all received mailings accounting for their investments and showing that their money· was growing. As the government succinctly notes, if the statements had accurately reflected the amount in these investors' accounts, the investors would have demanded their money back and the Ponzi scheme would have come to an abrupt end.

It is less clear whether the mailings received by William Surridge (Count 2) and ·Robert Nykamp (Count 3) contained fraudulent statements. The government asserts that the letters informing Surridge and Nykamp that DLAH had established a "separate account" for them constituted a material misstatement. However, it would have been impossible for Surridge and Nykamp to have had a separate account because McQueen comingled funds and moved money between investment companies. Nonetheless, the mailing in question must only be a part of the execution of the scheme to defraud, not actually fraudulent itself. DLAH was one of the vehicles McQueen used to run the Ponzi scheme. Therefore, the mailings received by Surridge and Nykamp—while potentially only routine or innocent—formed an integral part of the execution of McQueen's fraudulent scheme.

## B. Spending Money Laundering

▆ To establish that McQueen violated 18 U.S.C. § 1957 for spending money laundering, the government must establish five elements: (1) McQueen "knowingly engage[d] or attempt[ed] to engage in a monetary transaction"; .(2) he knew the funds involved "criminally derived property"; (3) the derived property had a value greater than $10,000; (4) the property was "derived from specified unlawful activity"; and (5) the offense took place in the Unit-

ed States. 18 U.S.C. § 1957; *see also United States v. Rayborn*, 491 F.3d 513, 517 (6th Cir.2007). McQueen asserts that because there was insufficient evidence to show that he acted with intent to defraud under the mail fraud statute, the government failed to establish that he derived property from a specified unlawful activity. Additionally, McQueen claims that there is no evidence to show that the items identified in counts 9 through 12 were purchased with money derived from mail fraud.

As previously discussed, we found sufficient evidence to establish that McQueen committed multiple acts of mail fraud. This leaves only the question of whether McQueen used funds derived from mail fraud to make the purchases identified in counts 9 through 12. The government contends that McQueen waived this argument by not properly raising it in his Rule 29 motion. A review of McQueen's Rule 29 argument confirms the government's assertion, as McQueen addressed only the "specified unlawful activity" element for money laundering at that time. Thus, McQueen's newly raised issues regarding the purchase of items with criminally derived funds are reviewed only for a manifest miscarriage of justice. *See Guadarrama*, 591 Fed.Appx. at 351.

At trial, Agent Birdsong testified that in December 2008, McQueen made a wire transfer to New House Title in the amount of $274,874.96 for the purchase of a condominium in Fort Lauderdale, Florida. McQueen titled the property in his and his wife's name. On appeal, McQueen asserts that he used the condominium for business purposes, evidenced by the fact that "Lindauer included the property when marshaling assets from the McQueen companies." But McQueen offers no explanation as to why it matters if the funds are characterized as a business expense, especially since his business involved running a

Ponzi scheme. Additionally, McQueen claims there was no evidence that funds derived from mail fraud were used to purchase the condominium. However, the government provided evidence tracing funds in AIG and IOC investor accounts to McQueen's private account for the purchase of the condominium and showed that McQueen jointly titled property with his wife. McQueen fails to demonstrate that his conviction on count 9 constituted a manifest miscarriage of justice.

Next, McQueen challenges his conviction on count 10 for use of a cashier's check to purchase a diamond engagement ring from Sako Diamond Corp., claiming that the government presented no evidence that the funds used here derived from mail fraud. Agent Birdsong testified that McQueen lacked revenue other than investor funds in 2008 when he made the final $14,083 payment to Sako Diamond Corp. for the purchase of the ring. Therefore, the record contained enough evidence to establish his conviction on count 10 to satisfy the manifest-miscarriage-of-justice standard.

As to count 11, McQueen asserts that the government failed to demonstrate that he used criminally derived funds to purchase Harley Davidson motorcycles because Agent Birdsong could provide only a bank statement with an outgoing wire transfer but no destination for the transferred funds. Agent Birdsong testified that in July 2008, McQueen purchased two Harley Davidson motorcycles in Florida using money from McQueen Financial Account, solely deriving its funds from AIG and IOC investor accounts. Then, McQueen exchanged the motorcycles he purchased in Florida for motorcycles in Michigan, the motorcycles identified in count 11. While it is correct that Agent Birdsong could trace only a wire transfer from the McQueen Financial Account to

the Harley Davidson store in Florida, she provided the necessary link from that transfer to the eventual acquisition of the motorcycles in Michigan. As a result, despite McQueen's denial at trial that he used criminally derived funds to purchase the motorcycles, his conviction on count 11 did not constitute a manifest miscarriage of justice.

Lastly, McQueen contends that there was insufficient evidence linking criminally derived funds to the tuition payment made for his son's private boarding school. Agent Birdsong testified that she traced a cashier's check drawn on McQueen Financial Account in August 2008 and made payable to Riverside Academy in the amount of $29,850. The check was used to pay for McQueen's son's private boarding school. At that time, an IOC account provided the sole source of funds for McQueen Financial Account. McQueen fails to show a manifest miscarriage of justice for his conviction on count 12.

### C. Concealment Money Laundering

■ To prove a violation of 18 U.S.C. § 1956 for concealment money laundering, the government must establish three elements[6]: "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the ... source, ownership or control of the proceeds." *United States v. Marshall*, 248 F.3d 525, 538 (6th Cir.2001) (alteration in original) (quoting *United States v. Prince*, 214 F.3d 740, 747 (6th Cir.2000)). Count 32 of the indictment charged McQueen with transferring

money through Bertuca Bonding and Insurance ("Bertuca Bonding") to Fifth Third Bank in order to make a payment on his 1999 Avenger boat. McQueen claims there was insufficient evidence to show that he intended to conceal these funds. Because McQueen raised this argument in his Rule 29 motion, we review under the sufficiency-of-evidence standard. *See Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

At trial, John Bertuca, the former owner of Bertuca Bonding, testified that McQueen sent him a check for $345,000 "[t]o help pay some of the bills." Bertuca pitched the idea for McQueen to pay him for marketing because McQueen "said that he was making money and he needed [tax] write-offs." Bertuca admitted that he "ended up doing very little" marketing for McQueen and that he instead used the $345,000 to pay some of McQueen's loans. When asked about the check written for $48,451.44 to Fifth Third Bank, Bertuca confirmed that the money was not related to marketing but that he was unaware of its exact use. Despite Bertuca's lack of knowledge concerning the purpose of the check, the government presented financial documents linking the check to payment for McQueen's boat.

On appeal, McQueen describes the rationale for the transaction with Bertuca as being "a bit hazy in both men's minds." McQueen adds that "the entire transaction got away from [him]," but "there was no evidence produced that Bertuca's payment was for the purpose of hiding the source of any of the funds." Further, McQueen offers the following explanation:

> Defendant testified that the boat was to be used in the Bahamas, within [sic]

---

6. Both of the parties listed four elements for concealment money laundering, which parallels the Sixth Circuit Pattern Jury Instructions § 11.01, but this court has generally used only three elements in its opinions. *See, e.g., United States v. Prince*, 214 F.3d 740, 747 (6th Cir.2000).

connection with the Bahamas office, and that Bertuca was increasingly involved in vetting opportunities, such as California and Oklahoma. Bertuca had not been paid directly but had received loans from the companies for business creation.

The relevant determination on appeal is whether there was sufficient evidence for the jury to find McQueen guilty of concealment money laundering, not to assess credibility of testimony. *United States v. Henley,* 360 F.3d 509, 514 (6th Cir.2004) ("It is not the province of this Court, however, to weigh the credibility of witnesses—particularly in the context of determining whether sufficient evidence supports a conviction." (citing *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir. 1993))). Evidence at trial demonstrated that McQueen funneled money through Bertuca in order to pay McQueen's personal bills, including $48,451.44 for a 1999 Avenger boat. Based on Bertuca's testimony and the government's tracing of funds, there was sufficient evidence to demonstrate that McQueen used Bertuca as a "front man" in order to disguise the source of the funds. *See United States v. Beddow,* 957 F.2d 1330, 1335 (6th Cir. 1992) (finding that the use of a "front man" to disguise the sale of emeralds constituted a violation of 18 U.S.C. § 1956). As such, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found McQueen guilty beyond a reasonable doubt for concealment money laundering.

## D. Structuring

■ Federal law mandates that banks submit transaction reports for each deposit, withdrawal, or currency transaction that exceeds $10,000. 31 U.S.C. § 5313; 31 C.F.R. §§ 1010.311, .313. To prove a defendant committed the crime of "structur-ing" in violation of 31 U.S.C. § 5324, the government must establish the following elements:

> (1) the defendant must, in fact, have engaged in acts of structuring; (2) he must have done so with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) he must have acted with the intent to evade this reporting requirement.

*United States v. Sutton,* 387 Fed.Appx. 595, 599 (6th Cir.2010) (quoting *United States v. MacPherson,* 424 F.3d 183, 189 (2d Cir.2005)). A person structures a transaction by "conduct[ing] or attempt[ing] to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements." 31 C.F.R. § 1010.100(xx); *see also Ratzlaf v. United States,* 510 U.S. 135, 136, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("It is illegal to 'structure' transactions—*i.e.,* to break up a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement." (citing 31 U.S.C. § 5324)).

McQueen argued in his Rule 29 motion that the government lacked sufficient evidence to demonstrate that he intended to evade reporting requirements. He contends the same on appeal. As such, we review for sufficiency of evidence. *Jackson,* 443 U.S. at 318, 99 S.Ct. 2781.

In January 2010, McQueen went to Huntington Bank to cash a $23,163.04 check from the sale of his SUV. He had to open a new account with the bank in order to deposit the check because his existing account was frozen. McQueen then withdrew $9,000, $9,000, and $3,600 from the new account on three consecutive days. According to Nora Popma, the teller who

assisted McQueen, McQueen indicated that he did not want her to file a currency transaction report related to his withdrawals.

McQueen contends Popma only has a "vague recollection of [the] conversation she had with [him] when he made a withdrawal" because "it makes no sense that he would attempt to bypass the reporting requirement, when the report would already have issued the day he deposited the check." The government asserts that McQueen's argument is undermined by the fact that the depositing of a check does not trigger the filing of a currency transaction report because a check does not constitute currency under the statute. This is probably true, see 31 C.F.R. § 1010.100(bbb)(2), but only offers half of the explanation for the jury's verdict. Rather, we find that the district court provided a succinct factual explanation for McQueen's conviction during its denial of his Rule 29 motion:

> Regarding the structuring, I think the evidence of Ms. Popma, if that is believed by the jury, is sufficient to convince them of that based on he tried to cash a check at the beginning and he couldn't do it because of the wait. But then when he came back he had, as far as the deposits go, broken that down. I think it was 9, 9 and 3 and so it could be intentional structuring and that particular situation. Regarding not the deposit but the withdrawals.

There was sufficient evidence to find that McQueen violated 31 U.S.C. § 5324 by structuring.

## II. Sentencing

McQueen claims that his 360–month sentence: (1) violated the Eighth and Fourteenth Amendments because it was grossly disproportionate to the severity of the offenses he committed, the sentences received by his codefendants, and sentences received by others for committing similar offenses; (2) was substantively unreasonable since it did not take into account this was McQueen's first crime, it was nonviolent, and he is the sole parent to his son and a caretaker for his father; and (3) was procedurally unreasonable because the district court failed to deduct the $1.5 million invested in BRS Labs from the total loss of investor funds in calculating his offense level.

### A. Constitutional Challenge

We review preserved constitutional challenges de novo, *United States v. Hughes*, 632 F.3d 956, 959 (6th Cir.2011), while unpreserved objections fall under plain error review. *See United States v. Ellis*, 483 Fed.Appx. 940, 941 (6th Cir.2012). Although McQueen raised several procedural and substantive objections during sentencing, he failed to preserve his constitutional challenge. Therefore, it is reviewed on appeal for plain error.

We evaluate Eighth Amendment claims with a "narrow proportionality principle" in noncapital cases. *Graham v. Florida*, 560 U.S. 48, 59–60, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in judgment)). Under this standard, "punishment for crime should be graduated and proportioned to [the] offense," *id.* at 59, 130 S.Ct. 2011 (quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910)), but the proportionality principle "forbids only extreme sentences that are 'grossly disproportionate' to the crime," *id.* at 60, 130 S.Ct. 2011 (quoting *Harmelin*, 501 U.S. at 997, 111 S.Ct. 2680). In noncapital cases, "successful challenges to the proportionality of particular sentences have been exceedingly rare." *Ewing v. California*, 538 U.S. 11, 21, 123 S.Ct. 1179,

155 L.Ed.2d 108 (2003) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)). One of the most important factors in determining whether a sentence is grossly disproportionate involves comparing the "gravity of the offense" to "the harshness of the penalty." *United States v. Young*, 766 F.3d 621, 626 (6th Cir.2014) ("The Supreme Court has identified three 'objective criteria' for assessing proportionality.... But, in most cases, a gravity-versus-harshness analysis will answer the question...." (citations omitted)), *cert. denied*, —— U.S. ——, 135 S.Ct. 1475, 191 L.Ed.2d 418 (2015).

"The gravity of an offense depends heavily on the nature and circumstances of a particular case, including the harm or risk of harm, magnitude of the crime, degree of culpability, motive, and any other facts specific to the offense." *Id.* at 626–27 (citing *Solem v. Helm*, 463 U.S. 277, 291, 293–94, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). If the defendant is able to show that his sentence is grossly disproportionate, the court should examine the other "objective criteria": "the sentences imposed on others in the same jurisdiction," and "the sentences imposed for the same offense in other jurisdictions." *Id.* at 626. "[O]nly if we reach an initial inference of gross disproportionality must we consider the other criteria." *Id.* (citing *Harmelin*, 501 U.S. at 1004–05, 111 S.Ct. 2680).

In the instant matter, McQueen acknowledges the "loss is tragic" for those who invested in his company but claims that it was others who worked for him that "made gross misrepresentations to clients who trusted them." McQueen's scheme netted him approximately $3.2 million, not including money disbursed for business and travel expenses, while his investors lost about $32 million. It is evident, as the government observed in its brief, that

McQueen demonstrated almost no remorse, even during sentencing; instead, he continued to blame others, as he continues to do now, for the substantial losses incurred by his investors. And despite the magnitude of his crime, McQueen received a sentence of 360 months—well below the Guidelines range of life imprisonment. Generally, sentences within the statutory limitations do not violate the Eighth Amendment. *See United States v. Moore*, 643 F.3d 451, 455 (6th Cir.2011). Therefore, due to the combination of the magnitude of the harm caused by McQueen's actions and the below-Guidelines sentence imposed, McQueen is unable to show a grossly disproportionate sentence, especially since the constitutional challenge is reviewed for plain error. Because McQueen fails to establish the first factor, the other "objective criteria" need not be discussed.

Even assuming that McQueen could establish the first factor, he must then meet the other two "objective criteria." McQueen's brief supplies the court with a table containing a list of fourteen defendants, the amount of loss resulting from each of their Ponzi schemes, and the sentences imposed. However, McQueen failed to provide any citations to these cases even after the omission was noted by the government, inviting McQueen to provide the citations in his reply brief. Notwithstanding these omissions, it is not entirely clear that the defendants identified by McQueen provide appropriate comparisons. For example, McQueen lists Jeffrey Toft, Chad Sloat, and Michael Murphy as engaging a $40 million Ponzi scheme and receiving only 66, 70, and 48 months, respectively, but this is misleading without more information. Further research reveals that Toft, Sloat, and Murphy were only a part of a Ponzi scheme devised by Keith Simmons. Indictment at 3, *United*

*States v. Davey,* No. 3:12–cr–68 (W.D.N.C. Feb. 22, 2012). Simmons provides a better comparison than his codefendants: he was ultimately sentenced to 40 years' imprisonment for his operation of a Ponzi scheme that cost investors $35 million. *United States v. Simmons,* 737 F.3d 319, 320 (4th Cir.2013); Amended Judgment at 2, *United States v. Simmons,* 3:10–cr–23 (W.D.N.C. Dec. 8, 2014). We find this list of little assistance and fairly unsupportive of McQueen's claim that his sentence was disproportionate to others convicted of the same offenses.

McQueen also provides a table of sentences received by the codefendants in this case, arguing that his sentence is disproportionate to theirs. However, "[t]his court has held that the Constitution does not require proportionality between defendants." *United States v. Odeneal,* 517 F.3d 406, 414 (6th Cir.2008) (citing *United States v. Layne,* 324 F.3d 464, 474 (6th Cir.2003)). Even if that were not the case, McQueen's actions are easily distinguishable from the codefendants, as McQueen was the leader of the Ponzi scheme at issue and his codefendants pleaded guilty to the charges against them.

## B. Procedural and Substantive Reasonableness

"We review a sentence imposed by the district court for reasonableness." *United States v. Webb,* 616 F.3d 605, 608 (6th Cir.2010) (citing *United States v. Richardson,* 437 F.3d 550, 553 (6th Cir.2006)). Challenges to the substantive or procedural reasonableness of sentences are reviewed under the abuse-of-discretion standard. *Id.* at 609. "A sentence may be procedurally unreasonable if the district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what

the judge deems an appropriate sentence without such required consideration." *United States v. Borho,* 485 F.3d 904, 908 (6th Cir.2007) (quoting *United States v. Collington,* 461 F.3d 805, 808 (6th Cir. 2006)). A sentence may be considered substantively unreasonable "when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Id.* (quoting *Collington,* 461 F.3d at 808).

In the instant matter, the district court imposed a below-Guidelines sentence, finding life imprisonment inappropriate. A defendant who challenges a below-Guidelines sentence, as here, faces a very heavy burden in showing unreasonableness. *United States v. Greco,* 734 F.3d 441, 450 (6th Cir.2013). The district court specifically noted McQueen's criminal history category during sentencing and was surely aware of the nonviolent nature of these crimes. McQueen fails to offer any further explanation as to how the district court erred. He cannot meet his heavy burden of showing substantive unreasonableness.

Next, McQueen asserts that his sentence was procedurally unreasonable because of the inclusion of the investment in BRS Labs as a loss in the presentence investigation. According to McQueen, testimony by two employees of BRS Labs showed that the company remains "a viable business." The district court considered McQueen's argument and found that while the ultimate success of BRS Labs may impact the calculation of the restitution owed, it did not change his term of imprisonment. Even on appeal, McQueen cannot explain how the future viability of BRS Labs would result in a different sentence. Regardless, given that the range of loss associated with McQueen's offense level

starts at $20 million, *see* USSG § 2B1.1(b)(1)(L) (2014) (increasing the offense level to 22 for losses more than $20 million), and McQueen was assessed a total loss of approximately $32 million related to his crimes, the district court's inclusion of $1.5 million as a loss attributable to BRS Labs would not have lowered his offense level. As a result, McQueen's sentence was not procedurally unreasonable.

## III. Cumulative Error

"The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial." *United States v. Adams,* 722 F.3d 788, 832 (6th Cir.2013) (quoting *United States v. Sypher,* 684 F.3d 622, 628 (6th Cir.2012)). "In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo,* 376 F.3d 593, 614 (6th Cir.2004) (citing *United States v. Parker,* 997 F.2d 219, 221 (6th Cir.1993)).

McQueen contends that the district court erred in four ways: (1) permitting Agent Birdsong to explain the reason why her investigation into McQueen was initiated; (2) hurrying the defense counsel but not the government; (3) correcting defense counsel in front of the jury; and (4) overruling defense counsel's objection to the government's rebuttal. Based on the cumulative effect of these errors, McQueen asserts that a new trial is warranted.

### A. Agent Birdsong's Testimony

At trial, the government asked Agent Birdsong how her investigation into McQueen first started. Defense counsel objected to the question on the basis of hearsay. The district court overruled the objection, stating, "[T]his does not go to the truth of what she heard, but this just goes to why she further acts; in other words, what caused her to do something. It's limited to that." In answering the question, Agent Birdsong explained that she received a tip from a bank concerning James Wiederhold, who had a "financial relationship" with McQueen. The investigation into Wiederhold and McQueen's financial relationship revealed the "movement of money in amounts ranging from 20 to 50 to $100,000" between Wiederhold's and McQueen's accounts. Agent Birdsong also testified that the investigation into Wiederhold resulted in Wiederhold's conviction, but the district court struck that statement.

McQueen claims that the district court erred in overruling his hearsay objection and for permitting testimony about the conviction of Wiederhold. However, McQueen does not offer any analysis as to the district court's alleged error. The government maintains that Agent Birdsong's testimony constituted res gestae evidence since it was offered to explain why the IRS started its investigation. Although there is the potential for abuse of res gestae evidence, "[t]ypically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Adams,* 722 F.3d at 810 (quoting *United States v. Hardy,* 228 F.3d 745, 748 (6th Cir.2000)). We find that the district court did not err in overruling McQueen's objection.

Finally, McQueen's claim that the district court erred regarding testimony about Wiederhold's conviction is without merit. The district court struck the testimony, and we presume that the jury followed this instruction. *See, e.g., Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).

## B. Hurrying Defense Counsel

McQueen identifies five instances in which he believes the district court attempted to rush his defense counsel. The government responds by noting that the district court also urged it on multiple occasions to present its case efficiently.

The record reveals that the district court urged McQueen's counsel *and* the government to move their cases along both in front of the jury and outside its presence. The Federal Rules of Evidence specifically direct courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to ... avoid wasting time." Fed.R.Evid. 611(a)(2). Here, considering the number of witnesses and amount of evidence, it was well within the district court's discretion to urge the parties to use their time wisely. *See Davis v. City of Memphis Fire Dep't,* 576 Fed.Appx. 464, 469 (6th Cir.2014) ("The Federal Rules of Evidence grant district courts wide latitude to exercise control over the mode of examining witnesses."). Furthermore, McQueen has not made any claim that the district court cut short his questioning of witnesses or placed time constraints on the presentation of his case.

## C. Correcting Defense Counsel in Front of Jury

According to McQueen, "[t]he court erupted when Mr. Graham made an assertion about dividends related to Verizon." McQueen claims that this interruption by the district court "gave an appearance that the Defense was attempting to mislead."

The district court asked the attorneys to approach the bench following a question by defense counsel concerning dividends associated with Verizon. After a short discussion with the parties, the district court held a short conference in chambers to clarify defense counsel's confusion between a dividend growth rate and a dividend. The district court then brought the jury back into the courtroom and explained that defense counsel "made an honest mistake of confusing the dividend growth rate for the [Verizon] stock with the dividend as a percent of the current market value for the stock."

McQueen offers no substantive explanation as to how this prejudiced his case, simply contending that the interruption was "unnecessary." We cannot conclude that the district court erred in this instance.

## D. Rebuttal Argument

McQueen contends that the district court permitted the government to summarize its closing argument during its rebuttal, essentially "allow[ing] the government to give the first and last closing." Although McQueen acknowledges that the district court permitted his counsel to respond to the government's rebuttal, "the damage had been done."

During the government's rebuttal, it stated the following:

And [McQueen] lived off their money as well. He is taking a salary. This is not just about paying old investors with new investor money.... [H]e is living off the revenue. He has got no revenue. He has got no income. Why does he get $110,000 a month?

Defense counsel objected, arguing that this material was beyond the permissible scope of the rebuttal. Though the district court agreed, it chose not to interfere. Instead, the district court offered defense counsel a chance to respond to any new arguments raised by the government, but defense counsel indicated that he was satisfied.

The government maintains that its rebuttal was simply a response to McQueen's closing argument that he acted in "good faith," not an attempt to summarize its closing. However, we find no reason to

'explore whether this contention is true or not. Even assuming the government's arguments were beyond the scope of its rebuttal, the district court provided McQueen the opportunity to respond. And any damage that had been done could have been rectified by McQueen.

For those reasons, we find no cumulative error that was so prejudicial as to render McQueen's trial fundamentally unfair.

## CONCLUSION

In sum, sufficient evidence existed to convict McQueen of six counts of mail fraud, four counts of spending money laundering, one count of structuring, and one count of concealment money laundering. Additionally, McQueen's sentence did not violate the Eighth or Fourteenth Amendments nor was it substantively or procedurally unreasonable. Finally, the district court did not err in such a way as to constitute cumulative error.

**AFFIRMED.**